# EXHIBIT B

Part 1 of 2

FINRA ARBITRATION

```
————————————————————————————x
IN THE MATTER OF THE ARBITRATION        :
BETWEEN:                                :
                                        :
CHRISTOPHER WARREN BIBOW,               :   Case ID 14-03702
                    Claimant,           :
                                        :
          - and -                       :
                                        :
THRIVENT INVESTMENT MANAGEMENT INC.     :
and THRIVENT FINANCIAL FOR LUTHERANS,   :
                    Respondents.        :
                                        :
————————————————————————————x
```

## CLAIMANT'S FIRST AMENDED STATEMENT OF CLAIM

Representing the Claimant:
Donald L. Rhoads
Rhoads Legal Group PC
100 Park Avenue, Suite 1600
New York, New York 10017
drhoads@rhoadslegal.com
212.351.5087

## TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................................1

II. STATEMENT OF ISSUSES ...............................................................................4

III. STATEMENT OF FACTS ...................................................................................7

    A.   Claimant Mr. Bibow ....................................................................................7

    B.   The Registered Representative Agreement...............................................8

    C.   The Financial Associate Agreement .........................................................9

    D.   The Relationship Between the Two Thrivent Respondents.....................10

    E.   Performance Under the Agreements .......................................................11

    F.   Additional Description of the Harm...........................................................30

IV. APPLICABLE AGREEMENT PROVISIONS .....................................................33

V. ARGUMENT FOR THE CLAIMANT ...............................................................35

    A.   The Subject Matter In Arbitration, the
           SDNY Action and Relief Already Obtained................................................35

    B.   Conversion, Theft, Attempts at Such and Conspiracy to Do So................37

    C.   The Thrivent Respondents' Sham Independent Contractor Scheme .........40

    D.   Revocation and Suspension of the Thrivent Respondents' Licenses........43

    E.   Breach of Contract ...................................................................................45

    F.   Wrongful Retaliation................................................................................46

    G.   Tortious Interference................................................................................47

    H.   Unfair Competition, Misappropriation and Related Torts .........................47

    I.   Unjust Enrichment and Restitution ..........................................................48

    J.   Trade Libel and Defamation ....................................................................49

    K.   Intentional Or Negligent Infliction of Emotional Distress.........................50

    L.   Right of Publicity .....................................................................................50

    M.   Withholding of Compensation ..................................................................51

    N.   Additional Issues from Discovery and Evidence Taken by Thrivent .........51

VI. RELEIF REQUESTED .......................................................................................52

VII. CONCLUSION ..................................................................................................54

# I. INTRODUCTION

1.  Claimant, Christopher Warren Bibow, was the right person at the right time and in the right circumstances to generate an astonishing amount of new business for the Respondents. Mr. Bibow was contractually an independent contractor under two separate agreements, one with each of the Respondents, Thrivent Investment Management Inc. ("Thrivent Investment") and Thrivent Financial for Lutherans ("Thrivent Financial") (collectively, the "Thrivent Respondents"). Both agreements were signed in mid-2013 and concerned the sale of insurance, annuities or other securities. Both of the agreements unequivocally specify that Mr. Bibow was to be self-employed and completely "independent," responsible for his own business, including his own advertising, prospects and clients, with "opportunities for financial reward and personal satisfaction" but also the "entrepreneurial risk of loss." Respondents repeatedly told him he was developing his own business and his own clients and that they were there just to help.

2.  For more than 100 years, the Thrivent Respondents focused exclusively on Lutherans – they actively sought, and permitted, only Lutherans to be "members." These "members" are also called customers and clients by Thrivent. Then, in early 2013, in the face of dramatically declining Lutheran churches, they decided to change course and actively seek other Christians as clients. Exhibit A. For the most part, it was very slow going. The testimony will show that more than 100 years of tradition translated into a huge impediment because the Thrivent Respondents did not understand their new clients. And their new clients had never even heard of them. The Thrivent Respondents were effectively in new territory where they did not speak the language and no one recognized them.

3.  Mr. Bibow created a path to change all this that had eluded Thrivent. Mr. Bibow bridged these previously unattainable clients (e.g., Iron Sharpens Iron members, Christian Festival Association attendees, New Canaan Society members) with the Thrivent Respondents. He spoke the language of the new clients and attended huge Parachurches and Christian Festival Association events that most Lutherans just did not attend. But he also knew the business of the Respondents and how that could relate to these new clients. And perhaps most importantly, he also knew and was close friends with several of the key leaders of these new clients, who will each testify at this arbitration. With these unique qualifications, his business generation, including his lists of prospects and new clients, skyrocketed beyond anyone's expectations. He did this with a new business method he invented and developed, which he called the Christian Straight Line Method, that he proved generated thousands of prospects at a time that were highly desirable, motivated customers that readily became clients.

4.  This is not a typical "prospective client" situation in a broader sales field experience where a list of names of prospects is acquired that may never amount to much. These are very interested and highly motivated clients that feel comfortable and ready to commit because Mr. Bibow came recommended by the Parachurch or Festival organization that the client's trust. There were no other providers in this space that had Mr. Bibow's message. The clients came to these events seeking to improve their lives and the Claimant showed them how he could help in a way that Thrivent had never done and did not understand.

5.  Claimant's closing rate was an astounding 82% compared to Thrivent's 33% average. Thrivent personnel (e.g., James Beland, Kent Tedford, Nolan Johnson, Michael Gollenberg, Paul Marks, Sam Chang, Jim Clouser, Rebecca O'Brian, Jon Skov) clamored to learn Claimant's method. A 4Thrivent manager, Kent Tedford, acknowledged that he "was convinced" and that it

"really works" when 5,000 valuable prospects were generated in a single weekend at a Christian Festival as was reported to him by another Thrivent partner, Paul Marks. Others made the same observation (e.g., Robert Cerniglia, Jon Skov). This was clearly something the Thrivent Respondents had never and could never have done. Mr. Bibow's lists of these valuable, prospective customers alone were orders of magnitude greater than anything the Thrivent Respondents had seen in the past.

6.   The old Thrivent guard immediately took notice of Mr. Bibow's success. The evidence will show that while they hold themselves out as special, serving a better "Thrivent Way," claiming to practice higher ideals than others (e.g., Exhibit B), in practice they do the opposite. Instead of promoting and supporting Claimant and treating him as the exceptional independent contractor he was, the highest levels of the Thrivent management, leading others, using unethical and illegal methods, wrenched his business from him.

7.   Officers, managers, employees and partners alike undercut him at every turn, disparaged his name and attempted to go around him and his independent contractor status and take his customers. In doing so, they abandoned any sense of propriety and ran roughshod over their contractual obligations and the FINRA rules and regulations in a great haste to steal a share of money that their Lutheran-only business could never generate in the past. Mr. Bibow had shown them the key to vast revenue generation that prior to his efforts they could not attain. So they terminated his agreements without cause and tried to make sure he would never work in the industry again, ignoring the truth and using slander, libel and defamation to effectively blackball him. They wanted no competition from him and have gone to great lengths to ensure there is none. They have stolen his clients, his method, his profits and his livelihood.

8.  The Claimant respectfully requests that the Panel remedy the harm and restore Claimant to where he should be and would be if the Thrivent Respondents had acted lawfully and ethically and within the agreements they made with him.

## II. STATEMENT OF ISSUES

- Did the Thrivent Respondents steal Mr. Bibow's prospective clients, clients, methods and profits? In particular, are the Thrivent Respondents' officers (e.g., CEO Brad Hewitt, VP Michael Fuehrmeyer) and partners (e.g., Michael Gollenberg, Timothy Campbell) and others guilty of **conversion and theft** (and attempted conversion/theft and conspiracy to commit conversion/theft) of Mr. Bibow's prospective clients, clients, methods and profits relating to Iron Sharpens Iron members, Christian Festival Association attendees, New Canaan Society members and other groups?

- Did the Thrivent Respondents and their officers, managers, employees and partners run a **sham independent contractor scheme** to fraudulently get the benefits of contractors but actually treat them like employees where they did not have their own business and did not have their own clients?

- Did the Thrivent Respondents and their officers, managers, employees and agents **violate FINRA rules and regulations,** and break other laws, including by their use of non-compliant advertisement, by solicitation of clients while lacking the proper licensing, by making false statements in Claimant's Form U5, by delinquent Form U5 reporting after the 30 day deadline to do so, by refusing to correct the false Form U5, by use of Claimant's name and likeness at trade shows (e.g., SoulFest 2014) and print materials (e.g., as late as December 2, 2014) after Claimant's agreements were terminated, and by other actions shown by discovery and the information taken from Claimant when his agreements were terminated? Should FINRA **revoke or suspend their licenses**?

- Did the Thrivent Respondents **breach** their obligations under their agreements with Claimant, including by treating him as an employee and not as an independent contractor, by otherwise interfering with his business, by trying to take his business,

method, prospective clients and clients, by not honoring their implied covenant of good faith and fair dealing, by not compensating and honoring their obligations to him fully, or by their termination of his agreements? If so, were such breaches willful?

- Did the Thrivent Respondents wrongfully **retaliate** against Claimant, including by treating him with hostility, by not fully compensating him, and by terminating his agreements, because he requested his share of revenue or reported FINRA violations to the Human Resources department?

- Did the Thrivent Respondents **tortiously interfere** with Claimant's business and future by their actions, including by not treating him as an independent contractor, by otherwise interfering with his business, by trying to take his business, method, prospective clients and clients, by not compensating and honoring their obligations to him fully, or by their termination of his agreements?

- Did the Thrivent Respondents commit **unfair competition, misappropriation** and other related torts by their actions, including by their not honoring their contractual obligations with him, by their attempts to take his business, prospective clients, and clients, by their use of his business method, prospective clients, clients, documents they had and retrieved, name and likeness after his agreements were terminated, or by filing and maintaining false Form U5 statements and otherwise using slander, libel and defamation and by refusing to correct the false Form U5?

- Were the Thrivent Respondents **unjustly enriched** in their actions concerning Claimant, and should there be restitution of this lost revenue from this wrongful conduct, including by not treating him as an independent contractor, by otherwise interfering with his business, by trying to take his business, prospective clients and clients, by not honoring their implied covenant of good faith and fair dealing, by not compensating and honoring their obligations to him fully, by their termination of his agreements, or by their actions after their termination of his agreements where they used his business method, prospective clients, clients, documents and other information they had or retrieved, and his name and likeness?

- Did the Thrivent Respondents commit **trade libel and defamation** concerning Claimant by their actions, including by statements made to his prospective clients and clients, co-workers, prospective

employers, and in Form U5 statements and by refusing to correct the false Form U5?

- Did the Thrivent Respondents **intentionally or negligently inflict emotional distress** on Claimant by their actions, including by treating him with hostility and unfairness, by breaching their agreements with him, by not treating him as an independent contractor, by otherwise interfering with his business, by trying to take his business, prospective clients and clients, by not honoring their implied covenant of good faith and fair dealing, by not compensating and honoring their obligations to him fully, by their termination of his agreements, by trade libel or defamation, or by their actions after their termination of his agreements where they used his business method, prospective clients, clients, documents and other information they had or retrieved, and his name and likeness?

- Did the Thrivent Respondents infringe Claimant's **right of publicity** by their actions, including by falsely stating he was at events (e.g., the SoulFest event in August of 2014) and implying he was still working with the Respondents, and by their use of his name and likeness to attempt to take his prospective clients, clients and new clients?

- Did the Thrivent Respondents **withhold compensation, his rightful share of sales, and the reimbursement of expenses** from Claimant from past, current and future revenue generating events?

- Does the discovery held by the Thrivent Respondents, evidence wrongfully taken from Claimant when his agreements were terminated without basis, and testimony in this arbitration reveal **additional harms**, other FINRA violations and additional wrongdoing that should be remedied?

- What **remedies** in specific performance (e.g., corrective advertisements, reinstatement of business position, correction of Form U5, revoking or suspending Thrivent's licenses), compensatory damages (e.g., putting Claimant back where he should be, past, current and future earnings), punitive damages, attorney fees and related costs and expenses of this arbitration, should be awarded Claimant for the Thrivent Respondents' actions and harm that they caused?

## III. STATEMENT OF FACTS

### A. Claimant Mr. Bibow

9.   The Claimant has been a securities industry professional for more than 15 years and he has a broad range of relevant skills and experiences. He was engaged by the Thrivent Respondents in a first position from on or about May 25, 2011 to January 20, 2012 as an employee, and in a second position from on or about March 20, 2013 until August 6, 2014 as an independent contractor, and expressly *not* as an employee (Exhibits C and E). This second position concerns this arbitration (the first position and intervening period before the second position are not at issue here) and Mr. Bibow was part of RFO115 at Thrivent, which group is generally responsible for the northeast part of the country.

10.   Previously, Mr. Bibow has had senior positions with Investor Analytics, Xiphoid Capital Advisers, Paladyne Systems, Inc., SunGard VPM, National Securities, Inc. and Merrill Lynch, among other financial concerns. His professional skills and development include FINRA Series 7, Series 66, FIC, and he is a member of PRMIA, CTHFA and the NY Hedge Fund Round Table. He received an MBA in Finance with distinction in 2001 from Hofstra University. He also received three BA degrees in Accounting, Business Administration and Economics in 1997 from Gordon College, the Christian College where Mr. Bibow began making the connections and relationships that are critical here, including with Dan Russell, the founder and President of the SoulFest and NewSound Concert events and an active member of the Christian Festival Association. Mr. Bibow resides with his wife and two children in Darien Connecticut.

B. **The Registered Representative Agreement**

11. The Claimant was engaged by Respondent Thrivent Investment as an independent contractor on or about May 27, 2013 under a Registered Representative Agreement ("RR Agreement"). Exhibit C. That agreement states that Mr. Bibow's "primary duty and principal business activity shall be the solicitation of securities transactions (including insurance and annuities)." Exhibit C, page1, Section I.A. Thrivent Investment is a brokerage and investment adviser firm that is a wholly-owned indirect subsidiary of the other Respondent, Thrivent Financial. Thrivent Financial directs the management or policies of Thrivent Investment according to www.finra.org. Exhibit D, see page 6, marked at bottom right.

12. The RR Agreement states that "Representative shall act at all times as a self-employed independent contractor" and "shall have full control of his or her daily activities, with the right to exercise independent judgment as to the time, place, and manner of soliciting securities transactions, servicing customers, and otherwise carrying out his or her duties under this Agreement." Exhibit C, page 1, Section I.A.

13. The RR Agreement confirms this independence of the contractor role again on page 1, Section I.B, when it states that "As an independent contractor, Representative has the right to determine who he or she will solicit and the methods used," again on page 2, Section II.E, when it states that "As an independent contractor, Representative has the full right to exercise his or her independent judgment in determining whether to advertise. Any advertising undertaken by Representative will be at his or her expense," and again on page 3, Section II.G, when it states that "As an independent contractor, Representative has the right to determine the method, manner, time and place of performing his or her solicitation activities under this Agreement." Exhibit C.

14. Thus, the RR Agreement explicitly and unequivocally creates an independent contractor relationship that provides a contractor, such as Mr. Bibow, freedom concerning who will become *his* clients and how he conducts *his* business without competitive interference from the Thrivent Respondents.

15. The RR Agreement has no choice of law provision but it does provide an arbitration provision that states that "Any dispute between Representative and [Thrivent Investment] must be arbitrated and will be subject to the provisions of the FINRA Code of Arbitration Procedure." Exhibit C, page 6, Section V.J. The RR Agreement was signed by one Thrivent officer, Michael Fuehrmeyer, identified as "Divisional Vice President" on the FA Agreement, along with Mr. Bibow.

### C.  The Financial Associate Agreement

16. Claimant was also engaged as an independent contractor by the other Respondent, Thrivent Financial, on or about May 27, 2013 under a Financial Associate Agreement ("FA Agreement"). Exhibit E. That agreement states that Mr. Bibow's "primary duty and principal business activity shall be the solicitation of applications for insurance (including annuities)." Exhibit E, Section I.A. Thus, the scope of the FA Agreement and the RR Agreement overlap at least in the areas of insurance and annuities.

17. The FA Agreement states that "Contractor shall act at all times as a self-employed independent contractor" and "shall have full control of his or her daily activities, with the right to exercise independent judgment as to the time, place, and manner of soliciting insurance, servicing contract members, and otherwise carrying out his or her duties under this Agreement." Exhibit E, page 1, Section I.A.

18. The FA Agreement confirms this independence of the contractor role again on page 2, Section II.E, when it states that "As an independent contractor, Contractor has the full right to exercise his or her independent judgment in determining whether to advertise. Any advertising undertaken by Contractor will be at his or her expense" and, again, on page 2, Section II.G, when it states that "As an independent contractor, Contractor has the right to determine the method, manner, time and place of performing his or her solicitation activities under this Agreement." Exhibit E.

19. The FA Agreement has no choice of law or dispute resolution provisions. It was signed by two Thrivent representatives, Michael Fuehrmeyer, identified again as "Divisional Vice President," and Timothy Campbell, identified as "Managing Partner," along with Mr. Bibow. Exhibit E.

**D.   The Relationship Between the Two Thrivent Respondents**

20. As demonstrated above, the FA Agreement and the RR Agreement overlapped in their scope by both explicitly applying to the sale of annuities and insurance. Therefore, in a typical interaction between Mr. Bibow and a prospective client or client, where he discussed the products described in both agreements, both agreements would apply with significant overlap and their coverage could not be (and were not) practically distinguished.

21. It is also understood that the officers, managers, employees, partners and purported independent contractors responsible for the harm to Mr. Bibow also had relevant relationships with both of the Thrivent Respondents and that Thrivent Financial actually controls Thrivent Investment (e.g., Exhibit D, page 6).

22. As would be expected by the overlap in scope of the two agreements and personnel, the Thrivent Respondents acted as interchangeable concerns in their activities with Mr. Bibow. For

example, the August 6, 2014 letter terminating the agreements from <u>both</u> Respondents (Exhibit F, which was sent to Mr. Bibow missing page 3, which Thrivent to date will not provide) was sent on Thrivent Financial letterhead, and Timothy Campbell, who signed the letter as a Managing Partner of Thrivent Financial, stated, "I appreciate your service to Thrivent Financial for Lutherans," without separately identifying Thrivent Investment, although he purportedly terminated the Thrivent Investment agreement for them.

23. This lack of distinction between the two entities, the overlapping agreements, their identical activities and their identical personnel as applied to Claimant's causes of action that are set forth herein establish that Thrivent Financial and Thrivent Investment are each jointly and severally liable for the harm done to Claimant.

**E.     Performance Under the Agreements**

24. Both the FA Agreement and the RR Agreement state that Mr. Bibow "acknowledges that he or she has chosen this independent relationship, with its opportunities for financial reward and personal satisfaction, in preference to one which would place him or her in an employment status, and he or she accepts the entrepreneurial risk of loss." Exhibit C, page 1, Section I.A.; Exhibit E, page 1, Section I.A. In the performance of the agreements, as demonstrated below, the Thrivent Respondents did not honor this and other provisions, attempting to limit Mr. Bibow's independence and interfere with and take his business, method, prospects and clients, and thus Mr. Bibow was denied the explicitly recited independent relationship, financial reward and personal satisfaction by the Thrivent Respondents.

25. Mr. Bibow was an outstanding new client generator and revenue generator as a Financial Associate and Registered Representative. He was involved with the sale of annuities, variable annuities, common stock, life insurance, and mutual funds, among other things, and he enjoyed a

closing rate as high as 82% with clients, which is very high in his field, with the average at the Thrivent Respondents at approximately 33%. Exhibit G. Mr. Bibow was one of the top contractors within the organization of the Thrivent Respondents and had made "Conference," a distinction for top performers.

26. The Thrivent Respondents' traditional (100 plus years) client base was practically and effectively limited to members of the Lutheran Church. The Thrivent Respondents had recently desired in early 2013 to expand to other Christian denominations (Exhibit A), but the testimony will show that they had no experience on how to do so. They began to apply their usual methods, on an individual-by-individual basis, that they then hoped would lead back to the individual's Church for additional sales.

27. All of the training materials used by the Respondents with Mr. Bibow and others discuss approaches that involve an individual client leading to an individual Church, and many of these materials still focus only on Lutherans. None of Respondents' materials address non-denominational Churches, Parachurch organizations or Christian festivals and other events. The Respondents did not know enough to consider how to approach them. In colloquial terms, the Thrivent Respondents did not know how to speak the language of these new clients that they desired but which they had no workable path to obtain.

28. Mr. Bibow saw this situation and after much investment of time and money, invented and further developed ways to vastly improve the Thrivent Respondents' business generation abilities with a go to market strategy that the Thrivent Respondents did not have. During 2013, Mr. Bibow developed a unique business method, which he called the Christian Straight Line Method ("CSLM"), where he did not just proceed on an individual-by-individual or even Church-by-Church basis in the manner of the Thrivent Respondents. He had and further

developed unique family and friend contacts within very large religious organizations, which were larger than individual Churches, such as Parachurches, Christian music festivals, and Christian radio stations, which he referred to in order to create his new approach. These relationships were original and personal to him, and were relationships that he alone developed to provide new and broad access to business generation of a type and scale that the Thrivent Respondents had not done and could not do themselves.

29. The evidence will show that Mr. Bibow spent many hours developing and testing his method in 2013. He described it as a spoke-and-hub method. It begins by approaching each of the Parachurch-festival-type organizations as a "hub" and building a relationship with their leaders, often converting some to clients, and negotiating speaking, sponsorship, booth and marketing arrangements, while explaining the mission and Thrivent Choice (similar to a rebate/incentive program) advantages of Thrivent. This leads to opportunities to convert the organization's many members into clients, and from that point following the clients, or "spokes," out to their individual, generally non-Lutheran church congregations to make additional sales.

30. In contrast, the method used by Thrivent for many years is different and it is described in their training materials. They first assigned each agent to several individual Lutherans to make their sales. If the agent made a certain number of sales to these individuals, the agents were then encouraged and permitted to follow the clients back to their Lutheran congregations to make additional sales. This approach starts with the client as a "spoke" that leads back to the congregation as the "hub." At the "hub" level, the Respondents had another layer of marketing assistance, called the Community Engagement Team or CET. However, as can be seen from their description under "Support Church Growth," they are still to this day focused on only "Lutheran organizations." Exhibit H. Thus, the Thrivent method may have worked fine with

Lutherans, but it did not work so well with other Christians with a different culture than what Thrivent had appreciated in the past.

31. Mr. Bibow then developed new ways of using the Thrivent approved tools (e.g., brochures, titles, booths) and messages to tailor them to the Parachurch-festival-type organizations and members.

32. The pastor of a local non-denominational church, Mark Orr, Mr. Bibow's father-in-law, will testify that he worked with Mr. Bibow for many hours over several weeks in developing the way Mr. Bibow would present the Thrivent materials. This work was recorded on the laptop that Mr. Bibow used that the Respondents demanded with legal threats in August 2014, and, to date, Thrivent has refused to return the laptop and any of Mr. Bibow's files back to him despite his independent contractor status. The result of this work was the dramatic success Mr. Bibow met until his agreements were terminated. The evidence will establish that Thrivent (e.g., Sam Chang) is now copying Mr. Bibow's method and using it with Mr. Bibow's prospective clients and clients.

33. The Claimant's Christian Straight Line Method identified these "hubs" of groups of prospects and clients that the Thrivent Respondents were not aware of and had not approached, created mutually beneficial relationships with the groups' leaders, developed and further refined an approved message compliant with all applicable rules and regulations, and tailored that message to the culture of the particular group. This is a method the Thrivent Respondents had not done before and could not do because they did not know of the groups and had never approached them before, did not know of and had no relationship with the groups' leaders, had not developed a relevant message and had not tailored any messages to the culture of the particular groups. As an example, a Thrivent employee, Christine Crane, informed Mr. Bibow on

December 13, 2013 in an email that Thrivent had not approached the Christian Festival

Association before Mr. Bibow did.

34. When Mr. Bibow applied his new CSLM method to his independent contractor business

with the Thrivent Respondents he became responsible for several firsts at Thrivent. He was the

first to invent and further develop a method such as the Christian Straight Line Method. He was

also the first to successfully access large numbers of clients from the nation's largest

Parachurches, Christian music festivals, Christian radio stations and the broader Christian

marketplace. He was also the first to develop and implement his unique marketing message that

was compliant with all applicable rules and regulations and tailored to the culture of each group.

He was the first to approach the upper management of these groups to develop these

relationships into beneficial business generation. He was thus the first to develop and implement

a professional relationship with dozens of groups of these potential clients, which will be

confirmed by the testimony of the leaders of these groups, including Iron Sharpens Iron, The

New Canaan Society, K-LOVE Radio, SoulFest, NewSound Concerts, Young Life and

KingdomBound, and working with other local, regional and national Christian music promoters

often representing hundreds of thousands and even millions of clients.

35. Mr. Bibow had developed the CSLM method to obtain a client base of conservatively at

least 2,000 client prospects per year, all with highly relevant backgrounds and economic

situations that were the most desirable for this business. Specifically, this client base is derived

from examples such as Iron Sharpens Iron Men's and Women's Ministry (e.g., 35

conferences/year with access to at least 48,000 prospects per year)(Exhibit I); New Canaan

Society (e.g., several conferences/year with access to 51 chapters across the country and at least

10,000 prospects per year)(Exhibit J); SoulFest (e.g., with access to at least 15,000 prospects

over 4-5 days)(Exhibit K); NewSound Concerts (e.g., 10 concerts/year each with at least 1,000

prospects)(Exhibit L); KingdomBound (e.g., with access to at least 15,000 prospects over 3-4

days)(Exhibit M); and other Christian Festival Association members (e.g., with access to

thousands of prospects at 15 large festivals/year and 1.3 million members)(Exhibit N). Other

groups include K-LOVE Radio, Community at the Cross, Reach Young New England, Young

Life, Navigators, Women of Faith, Pulse Movement, Charleston Men of Integrity, Creation East,

Creation West, The Lighthouse Productions, The Lighthouse Events, Jeff Wall and others, each

with large numbers of prospective clients. He also introduced the Respondents to the band,

"Casting Crowns" and their song "Thrive," and recognized the valuable branding, marketing and

promotional value of a relationship with these artists. As an independent contractor, Mr. Bibow

spent significant resources and time developing each of these organizations and their leaders as

his clients.

36. Mr. Bibow was also the first to develop and implement a high-end physical trade show

booth with new Thrivent compliant branding, sales techniques, video advertising, and prominent

display of the "Thrivent Way" concept he tailored to this new client base.  This was a necessary

part of his strategy and something that Thrivent did not have or do with these new target market

customers. He was also the first to develop and refine a staffing concept used at these particular

meetings and events that had large numbers of potential clients and that had not been addressed

by Thrivent in the past. This included a way for individual Financial Associates and Registered

Representative to get credit for leads at these particular, large events that had never before been

done by Thrivent. He was the first Financial Advisor and Registered Representative to operate

on a local, regional and national level as he serviced his clients from these groups that have a

national presence. Mr. Bibow had the proper licenses for these clients in at least Connecticut,

New York, California, Florida, North Carolina, Colorado, New Jersey, New Hampshire, Massachusetts, South Carolina, Maryland, the District of Columbia and Tennessee. Thrivent did not understand these new clients or how to reach them until Mr. Bibow developed and implemented his CSLM method.

37. As a result of the application of the CSLM method, Mr. Bibow was about to contractually arrange to speak in seminars for 2014, 2015 and beyond with Iron Sharpens Iron, New Canaan Society, and at Christian music concerts with NewSound. He was also in the process of arranging for such events with LightHouse Productions, Young Life and several other Parachurches and similar organizations.

38. Thrivent officers, managers, employees, partners and independent contractors wanted to know how Mr. Bibow was applying his method. They included James Beland, Kent Tedford, Nolan Johnson, Michael Gollenberg, Paul Marks, Sam Chang, Jon Skov, Jim Clouser, Robert Cerniglia, Benjamin Kjendal, Rebecca O'Brian, Sara Onyango and Amy Kierzak. They were astounded by the success.

39. High ranking officers, managers, employees and partners of the Thrivent Respondents, including Michael Fuehrmeyer and Timothy Campbell, who had signed the FA and RR Agreements and were well versed in Mr. Bibow's independent contractor status, in particular took notice of Mr. Bibow's successes, including his business method and his multiple "firsts" identified above. They stepped in despite the clear agreement language to the contrary and began attempting to interfere with and otherwise limit Mr. Bibow's contact with his clients and otherwise interfere with Mr. Bibow's business generation, in order to attempt to take the business for themselves or otherwise obtain credit and remuneration for it.

40. The interference and disruption became sustained and aggressive. In breach of the agreements, Mr. Bibow's clients (e.g., Iron Sharpens Iron in New York (e.g., recorded in several emails)), New Canaan Society in Connecticut (e.g., recorded in July 25, 2014 email to Human Resources or "HR"), SoulFest (e.g., recorded in July 25, 2014 email to HR)) were told false statements (e.g., don't deal with Claimant, he "is a local and regional guy" by CEO Brad Hewitt and CMO/SVPJames Thomsen) and told not to deal with Claimant but to deal with Thrivent officers, managers, employees and partners instead.

41. For example, Brian Doyle and Darien Stone, the originator and a manager of Iron Sharpens Iron, will testify that Mr. Bibow was their first contact with Thrivent and that they only wanted to deal with him because of their relationship with him and trust in his ability to provide services to their members that met with their particular requirements. Despite informing Thrivent of their wishes, they will testify that Thrivent employees and purported independent contractors working with the partners (e.g., Sam Chang and Kent Tedford) secretly went around Mr. Bibow to try to take the business for themselves.

42. Similarly, Dan Russell, the originator and leader of the SoulFest and NewSound Concerts, and an active member of the Christian Festival Association, will testify that Mr. Bibow was their first contact with Thrivent and that they only wanted to deal with him because of their relationship with him and trust in his ability to provide services to their members that met with their particular requirements. Despite informing Thrivent of the organization's wishes, he will testify that Thrivent partners secretly went around Mr. Bibow to try to take the business for themselves.

43. Also similarly, Jim Lane and Paul Michalsky, the originator and a manager of the New Canaan Society, will testify that Mr. Bibow was their first contact with Thrivent and that they

only wanted to deal with him because of their relationship with him and trust in his ability to provide services to their members that met with their particular requirements. Despite informing Thrivent of their wishes, they will testify that on numerous occasions, Thrivent officers (CEO Brad Hewitt and CMO/SVP James Thomsen) secretly went around Mr. Bibow with meetings and telephone calls to try to take the business and the control away from Claimant.

44. Behind his back, Mr. Bibow was not invited to meetings that he had arranged with Iron Sharpens Iron, the Christian Festival Association, the New Canaan Society and others, and the Thrivent officers, managers and partners circumvented other arrangements Mr. Bibow made with clients. The leaders of these organizations will testify that this interference was done with at least Iron Sharpens Iron, Christian Festival Association, The New Canaan Society, Soulfest, NewSound Concerts, KingdomBound, K-LOVE Radio and their Christian Music Concerts and Young Life.

45. Another example of such interference and attempt to circumvent the Claimant's independent relationships with clients was with the organization Young Life in New York City. Mr. Bibow had significant contacts with the organization's management. The Thrivent Respondents, including Michael Fuehrmeyer, after they learned of the potential business from Young Life from Mr. Bibow, attempted to go around him and create their own relationship, attempting to cut him out and take the business for themselves. Michael Fuehrmeyer fabricated a story that the leaders of Young Life already had a relationship with another Thrivent officer (Knut Olson) and that they were going skiing together. The testimony from the leaders of Young Life will demonstrate that this story was false and Mr. Bibow had initiated the relationship with this organization.

46. Another example of such interference and attempts to circumvent the Claimant's independent relationships with clients is with K-LOVE Radio, the largest Christian radio group. Mr. Bibow developed a relationship with this client, including a critical Board member, where Thrivent had no relationships, and informed Thrivent, including Michael Fuehrmeyer and Timothy Campbell. Walt Golembeski, a Board member of K-LOVE, will testify that they worked with Mr. Bibow to create a special project relating to Mr. Bibow's business alone. While Mr. Bibow waited for approval on content and copy for the advertisements from these same Thrivent partners, the Thrivent Respondents and these partners went behind him (and Mr. Golembeski and counter to his requests) to create their own relationship, attempting to cut Mr. Bibow out and take the business for themselves.

47. Thrivent was also very aggressive in demanding that Claimant provide them with his prospective client and client information, under the purported excuse that they would help him develop his independent contractor business. In retrospect, the reasons have been exposed as not so innocent. Specifically, the testimony will show that Michael Gollenberg was making these requests with the knowledge and backing of Michael Fuehrmeyer and Timothy Campbell. Later, it was learned that Michael Gollenberg was in the process of moving his brother, Marcus Gollenberg, from Hawaii to join Thrivent and do so in Connecticut, where Claimant lives, and that Claimant's lists would be provided to Marcus Gollenberg to take over Claimant's clients simultaneously with the termination of Claimant's agreements. Testimony from Claimant's clients (Zhanna Brown, Kerry Geffart, Richard Brauchler, Glen Johnson, Ted Schlomann) will show that on the day and day after Claimant's agreements were terminated, before he even got the termination letter, there was a concerted effort by Thrivent to take Mr. Bibow's clients that included Marcus Gollenberg calling Claimant's clients and disparaging his name.

48. Before the contract termination, a Thrivent employee, Kent Tedford, became increasingly hostile and aggressive towards Claimant. Mr. Tedford was in charge of developing business in Christian groups in Thrivent's organization ("Community Engagement Leader"). Exhibit H. He wanted and repeatedly tried to take Claimant's clients and cut Claimant out of the relationships Claimant had initiated and developed. Instead of developing his own clients, Mr. Tedford wanted Claimant's clients. Claimant reported this inappropriate behavior to Respondents' HR department, and specifically to their employee Tina Paulson. The HR department and Tina Paulson did nothing to protect Mr. Bibow from behavior that included material breaches of his agreements and treating him like an employee, and his clients as Mr. Tedford's, in breach of the agreements that established that Mr. Bibow was an independent contractor and his clients were his own.

49. The sustained and aggressive efforts by these and other officers, managers, employees and partners to take Mr. Bibow's business included the creation of a hostile work environment with other partners, with loud and negative yelling in front of prospective clients and clients and other employees and purported independent contractors (e.g., Paul Marks, a Thrivent partner, on August 3, 2014 in New York at the KingdomBound event).

50. The sustained and aggressive efforts by these and other officers, managers and partners to take Mr. Bibow's business also included the Thrivent partners' use of marketing techniques that violated FINRA rules and regulations, including the use of an unapproved and non-compliant advertisement and at least one partner who was soliciting clients despite lacking the correct licenses to do so, which was all part of these officer's, manager's and partner's aggressive attempts to take away Mr. Bibow's business.

51. Mr. Bibow was required by law and the Thrivent Code of Conduct (Exhibit B) to report these FINRA regulation violations (he had just days before taken a required continuing education course on the subject) and he did so in March and July of 2014 and on August 2, 2014 and August 4, 2014, using the correct internal process at the Thrivent Respondents. On August 6, 2014, just two days after Mr. Bibow's report of the latest FINRA violation, without any warning, in retaliation, and to further remove Mr. Bibow from his clients and separate him from and take his business, the Thrivent Respondents, and Timothy Campbell the Managing Partner in particular, unilaterally and without just cause terminated the FA Agreement and the RR Agreement.

52. Thrivent's termination letter and statement by Timothy Campbell in an August 6, 2014 phone call (Timothy Campbell and Tina Paulson from HR were on the telephone with Claimant) recited that he was terminated because he failed to follow instructions concerning Thrivent sponsored events.  Exhibit F. Claimant will testify that he did not understand what this meant and when he asked for an explanation, Mr. Campbell and Ms. Paulson refused to explain what was meant, evidencing a considerable lack of good faith.

53. This termination was a surprise to Claimant. The evidence will show that just a few weeks earlier, he had received an outstanding review from a supervisor and had achieved outstanding performance metrics as demonstrated by Thrivents' "Dashboard" report. Exhibit G.

54. Claimant will testify that he spent substantial time attempting to understand what was meant in the termination call, often exploring potential explanations that did not make sense upon further examination and review of past events, leading to significant pain and suffering, which could have been easily alleviated by Thrivent if they had a legitimate explanation and

were acting in good faith. The evidence will show that there is no legitimate explanation and no good faith.

55. Thrivent continued with the position that Claimant was terminated for failure to follow instructions concerning Thrivent sponsored events in their late, possibly backdated, Form U5 statement, that was sent to Claimant after the deadline set by FINRA regulations. Exhibit O. When Claimant pressed for an explanation for the termination of his agreements after receiving the Form U5, Thrivent at first maintained its refusal. Then, in late November of 2014, Thrivent broke its silence and its lawyer provided two explanations that made little to no sense (first, an alleged instruction by Michael Fuehrmeyer to not ask for compensation for sales to his clients that Thrivent cannot show was ignored and second, an alleged instruction by Paul Marks to not attend the August 2014 KingdomBound event, which the evidence demonstrated was never (and could not have been) given). Tellingly, that Thrivent lawyer has since been fired and Thrivent went back to maintaining silence. There is simply no evidence of any instruction that Claimant was given relating to Thrivent sponsored events that Claimant then did not follow.

56. Earlier in the week before the termination of the agreements, the Claimant's business method was applied to his clients, including the managers of a KingdomBound music festival, obtaining approximately 5,000 new prospects, a huge number the Thrivent Respondents had neither achieved nor come close to achieving in the past without Claimant. The Bibow business method had been proved again, in this instance at another large event. These results prompted a Thrivent manager and partner (Kent Tedford) to enthusiastically inform Mr. Bibow that he was "convinced" and that Claimant's business method "really works." He also expressed excitement about what could then be achieved applying Claimant's CSLM business method to another large event coming up at the end of that week, Soulfest.

57. Thus, there was much excitement among the Thrivent officers, managers, employees and partners concerning this large event, SoulFest, which was scheduled for August 7-9, 2014 in New Hampshire, although questions arose as to how such tremendous amounts of expected new business and resulting revenue would be shared. By terminating the Claimant's agreements on August 6, 2014, the Thrivent Respondents attempted to take Mr. Bibow's client and attempted to establish that Claimant's share of the results of applying his business method to his client would be zero.

58. The founder and owner of SoulFest, Dan Russell, was one of the Claimant's best client leads, a personal friend for 20 years from an event at Gordon College and another business generation source that Mr. Bibow had developed, spending his own resources. The August 7-9, 2014 SoulFest event had the promise of providing a tremendous amount of business for Mr. Bibow. However, Claimant did not attend the August 7-9, 2014 festival since his agreements had been terminated the day before. Despite this termination, which was known to the Thrivent personnel who attended the event, Dan Russell and his employees will testify that these partners, employees and agents of the Thrivent Respondents falsely informed him that Mr. Bibow was at the festival but that he should talk to them about business, never mentioning that the Claimant's agreements had been terminated. The Thrivent Respondents therefore used outrageous deception to apply the Claimant's business method and attempt to take away his business and claim it for themselves.

59. After the agreements were terminated, and even today (e.g., the week before Claimant's original Statement of Claim was filed), this deception continues and the Thrivent Respondents use the Bibow CSLM business method and prospect and client lists and are sending out advertisements and sales pieces based on them, often with Mr. Bibow's name and likeness, to

attempt to deceive and take away Mr. Bibow's clients, in further violation of FINRA rules and regulations, their contractual duties and other laws and regulations. These deceptive documents were sent out to clients in at least New York and Connecticut and to Connecticut in particular on at least the following dates: August 6, 2014, September 4, 2014, September 24, 2014, September 26, 2014, September 30, 2014, October 2, 2014, October 3, 2014, October 9, 2014, October 24, 2014, October 28, 2014, October 30, 2014, November 21, 2014 and December 2, 2014 (Exhibit P).

60. Similarly, records of recent Parachurch events since August 6, 2014, including Iron Sharpens Iron events, demonstrate that at least Sam Chang, Jon Skov, Alice Reiter and Nolan Johnson are using the Claimant's CSLM method (including the methods' tools, language and sales processes). This was with full knowledge and approval of the officers, managers, employees and partners, including Michael Gollenberg, Timothy Campbell and Michael Fuehrmeyer.

61. As referred to above, on the day the FA Agreements and RR Agreements were terminated, and following that date, the Thrivent Respondents, including their agent Marcus Gollenberg, who was working under his brother, Michael Gollenberg, a Thrivent partner, contacted Mr. Bibow's clients in states throughout the country. Donald and Zhanna Brown, two of Claimant's clients, will testify that on August 7, 2014, Marcus Gollenberg called them and asserted defamatory, libelous and slanderous information concerning Mr. Bibow's character (e.g., he was "not representing the culture that Thrivent seeks to represent") that was false, harmful and disparaging. The evidence will show that Marcus Gollenberg, working with his brother and supervisor, Michael Gollenberg, a Thrivent partner, developed this false and

defamatory message about Claimant and delivered it to all of Claimant's prospective clients and clients that they could reach.

62. In addition, the Thrivent Respondents are falsely stating that Mr. Bibow was "Discharged," implying that he was an employee that was fired for cause. Since Mr. Bibow was not an employee and he was not fired, and certainly not fired for cause, these statements are false and, we believe, intended to harm Mr. Bibow and cause him to not obtain employment and thus remove him from competition.

63. The Thrivent Respondents were also falsely stating that Claimant "Was Terminated For Failure To Follow Instructions Relating To Thrivent Sponsored Events ..." However, without explanation, they changed this statement to assert that Mr. Bibow's "Contracts Were Terminated For Failure To Follow Instructions Relating To Thrivent Sponsored Events ...," while evidence of a lack of due care, the new statement is also false because there were no instructions that were ignored. As discussed above, the Thrivent Respondents have been unable to identify any such instructions that were not followed. And the evidence will show that these false statements are intended to harm Mr. Bibow and cause him to not obtain employment and thus remove him from competition as the Thrivent Respondents continue to attempt to take Mr. Bibow's business, method, prospects and clients.

64. These false statements promulgated by Thrivent were provided to Mr. Bibow in a Form U5 statement with a cover letter, possibly backdated, expressly dated September 4, 2014 but in an envelope that is not postmarked until almost a week later on September 10, 2014. Exhibit O. The applicable FINRA regulations (e.g., Regulatory Notice 10-39) require that they be sent earlier, at the same time the Form U5 is filed with FINRA, here within 30 days of August 6, 2014, to people in Mr. Bibow's situation, amounting to another violation of the FINRA

regulations, and further continuing the harm. Such actions, including the delay, are wrongful and actionable under FINRA rules and regulations, and evidence a lack of proper supervision.

65. On November 25, 2014, Mr. Bibow was denied employment in a lucrative position specifically because of these false statements concerning "Discharged" and "Contracts Were Terminated For Failure To Follow Instructions Relating To Thrivent Sponsored Events ..." The representative from the potential employer United Planners will testify that they informed Claimant that he was not hired because the Form U5 statements indicated that Mr. Bibow had been "fired for cause," which is false.

66. The evidence will show that here have been additional employment denials to Mr. Bibow because of the false Form U5 that was made and maintained by Thrivent. To date, these include denials from Ameriprise, Edward Jones, Santander Bank, Morgan Stanley and Northwestern Mutual. For example, Jean Innucci of Santander will testify that she informed Mr. Bibow that they could not hire him with a "Form U5 like this."

67. To date, as discussed above, the Thrivent Respondents have refused to correct these false statements and have also failed to provide any support or justification for the false statements. They have done so after learning that the false statements are being relied upon by prospective employers to deny Mr. Bibow employment. The evidence will show that the Thrivent Respondents' continued making of these false statements is intentionally done with the objective of furthering their efforts to take away Mr. Bibow's business and stop Mr. Bibow from becoming employed as they attempt to apply the Claimant's business method for their own unjust gain and enrichment.

68. As discussed briefly above, counsel for the Thrivent Respondents first informed Claimant that the instruction that he allegedly did not follow was from Michael Fuehrmeyer who