# EXHIBIT B

Part 2 of 2

purportedly told Claimant to not request a percentage of the business generated by other independent contractors from Claimant's clients or that was otherwise generated by Claimant. However, counsel for the Thrivent Respondents could not identify a single instance when Claimant did not follow this purported instruction (even if it had been given). In addition, this purported instruction would have been in violation of the policies and practices of the Thrivent Respondents that allow and encourage agents to share credit and remuneration and Claimant's independent contractor status defined by the FA and RR Agreements (Exhibits C and E).

69. Counsel for the Thrivent Respondents then alleged that Claimant was instructed by Thrivent partner Paul Marks to not come to the KingdomBound event in August of 2014. However, counsel for Thrivent was unable to provide any support for this allegation and this purported instruction would have been in violation of the policies and practices of the Thrivent Respondents and Claimant's independent contractor status. In addition, (a) VP Michael Fuehrmeyer had informed Claimant previously that any independent contractor could come to any Thrivent sponsored event, (b) Claimant had clients at the event and had, independent of Thrivent, been invited to the event, and (c) other employees of Thrivent were aware that Claimant was attending the event and did not instruct him to not attend (nor could they give such an instruction).

70. The Thrivent Respondents' refusal to correct the false statements is made worse by the passage of time as Mr. Bibow continues to be denied employment because of the Form U5. In addition, the Thrivent Respondents have added to their culpability and lack of good faith by refusing to provide Claimant with an explanation or the underlying documents themselves that Claimant could then present to prospective employers to attempt to mitigate the damages Thrivent has caused. The Thrivent Respondents have maintained their refusal to provide a

correction, an explanation and the underlying documents for several months now, starting in November of 2014, compounding the harm.

71. For example, the Thrivent Respondents were asked to provide Mr. Bibow's personnel-type file in November of 2014. Connecticut law (Connecticut Personnel Files Act, Conn. Gen. Stat. 31-128a *et seq*) requires that employees be provided with their files immediately under certain circumstances. Although Mr. Bibow's two agreements with the Thrivent Respondents purportedly established an independent contractor relationship, the policies behind the law still apply. It was not until the parties' stipulation, after nearly two months of delay, which was entered as a Court Order (Exhibit S), did Thrivent agree to provide the files. However, as of the date of this filing, the complete files have still not been provided in violation of the Order. Partial files were provided on January 30, 2015 and then on February 4, 2015 of many irrelevant documents, missing the key documents that are known to exist, and they looked like they had been shuffled or otherwise put in a random order. The files are in such a state of disarray that they are further evidence of a failure to properly supervise.

72. With this repeated failure to provide justification, and the actions Mr. Bibow has been forced to take in response, including attempts to have the false statements stopped and corrected, a Complaint filed in the United District Court for the Southern District of New York (Exhibit R), and this FINRA arbitration, the Thrivent Respondents should be estopped from attempting to assert different grounds for alleging Mr. Bibow was "Discharged," or for attempting to justify the termination of his agreements, or for asserting that the Thrivent Respondents have somehow now found instructions that Mr. Bibow allegedly did not follow.

73. In summary, the Thrivent Respondents and their officers, managers, employees, partners and independent contractors worked in a concerted effort to wrongfully take Claimant's business

and then make sure that Claimant could never again work in the industry. These individuals who worked together against Claimant included but are not limited to the President and CEO Brad Hewitt, SVP James Thomsen (Chief Marketing Officer), SVP Knut Olson (Mission Advancement), VP Michael Fuehrmeyer (Divisional VP, East), Managing Partner Timothy Campbell, employee Marie Uhrich, employee Tina Paulson, employee Kent Tedford, employee James Belind, partner Paul Marks, partner Michael Gollenberg, and purported independent contractors Marcus Gollenberg, Sam Chang, Alice Reitz, Jon Skov, and Nolan Johnson. Exhibit S. They violated FINRA rules and regulations, additional laws and regulations, and the FA and RR Agreements with Claimant, and took and applied Claimant's method to Claimant's clients without compensating him.

74. Additional Thrivent affiliated persons with knowledge of the CSLM method and the taking of Claimant's clients and use of his method include William Bufkins, Jacob Kinney, Stephen Strand, Sarah Groleau, William O'Doherty, Ashley Decker, Bryan Schmeling, James Clouser, Robert Cerniglia, Andrew Wilkinson, Benjamin Kjendal, Keith Weston, Pamela Miscia, and Joseph Miscia. Exhibit S.

**F.    Additional Description of the Harm**

75. Mr. Bibow and his family have suffered mental and physical pain, and extreme financial, emotional and physical distress from the Thrivent Respondents' actions. The harm from Thrivent is even more severe because Mr. Bibow had developed his business, prospects and clients using close family members (e.g., Mark Orr), friends (e.g., Brian Doyle, Darien Stone, Dan Russell, Jim Lane, Paul Michalsky, Walt Golembeski, who were also the most influential leaders in the broad Christian, Parachurch world), and colleagues. Thrivent willfully harmed much of Mr. Bibow's entire world.

76. Certain key documents concerning the extent and amount of damages Mr. Bibow has suffered are currently in the hands of Thrivent and therefore the calculations defining the harm may be subject to modification.

77. Nevertheless, given the past outstanding record of Mr. Bibow, reasonable projections of lost revenue (including, among other things, loss of commissions, loss of monthly transition compensation, loss of revenue performance bonuses, loss of negotiating an advance against future commissions with another firm, loss of retirement plan and related benefit allocations, loss of other awards/fees) can be made. In a 27-year period, reflective of Mr. Bibow's age, record and potential, the conservative projection is that there would be at least approximately $3.5M in revenue per 70 prospects of the type Mr. Bibow had identified.

78. The total number of potential clients can be calculated from Mr. Bibow's records resulting from his efforts with the Christian Straight Line Method that yielded large numbers of clients that he developed in 2013 and had virtually perfected by 2014. For example, at the Iron Sharpens Iron October 5, 2013 event with about 2,000 attendees, the Claimant's method generated about 150-200 prospective clients.  Applied to this metric, a reasonable and very conservative projection is that Mr. Bibow would have obtained access to at least 2,000 new, valid prospects/year, including institutional-level clients (e.g., meeting the needs of an organization instead of just an individual), by himself, who, with other Financial Associates and Registered Representatives, would have worked the leads derived from Mr. Bibow's efforts. It was customary and appropriate for Mr. Bibow to also obtain at least partial credit and compensation from these other Financial Associates and Registered Representatives. Under these circumstances, Mr. Bibow would have obtained significantly more than $100M in revenue per year, reflecting the remarkable facts at issue here.

79. This very large number translates into a an even larger amount of revenue over the 27-year period that he would be expected to work and produce (i.e., Mr. Bibow is now 40 years old), which is further evidence that explains the actions and intent of the Thrivent Respondents, and particularly the officers, managers, employees and partners that observed the success of Mr. Bibow and then wrongfully tried to take his method, his image, his name, his business, his prospects, his clients and his revenue for themselves, denying him the fruits of his independent contractor position with the "opportunities for financial reward and personal satisfaction" that they had promised.

80. In addition to the above, Mr. Bibow was also not properly reimbursed for several expenses recorded on his laptop that was taken by the Respondents. Mr. Bibow was also not given a special bonus in 2014 for 20 new members he brought in by July 2014 under the New Member Incentive Plan. Mr. Bibow was also not compensated for a substantial amount of business that he developed with Jon Skov, Nolan Johnson, Paul Marks, Sam Chang, Alice Reitz and others, which they had agreed to provide to Mr. Bibow, as recorded in letters and emails stored on Mr. Bibow's laptop.

81. Also in addition, to the above, Mr. Bibow was not properly compensated for business identified on his latest "Thrivent Performance Dashboard" ($38,000 national sales credits plus a bonus for 36 applications pending as of July 14, 2014) and the revenue generated from at least the following events that he was responsible for arranging: (a) the Iron Sharpens Iron event in 2013 in Albany, New York, (b) the Iron Sharpens Iron event in 2013 in Rochester, New York, (c) the Iron Sharpens Iron event in 2013 in Oklahoma, (d) the Iron Sharpens Iron Women's event in 2013 in Worchester, Massachusetts, (e) the North East Lead Submit in 2013, (f) the Iron Sharpens Iron event in 2014 in Albany, New York, (g) the Iron Sharpens Iron event in 2014 in

Hudson, Massachusetts, (h) the Iron Sharpens Iron event in 2014 in Danbury, Connecticut, (i) the

Iron Sharpens Iron event in 2014 in Hartford, Connecticut, and (j) the Iron Sharpens Iron event

in 2014 in Worchester, Massachusetts, (k) the Iron Sharpens Iron Women event in 2014 in

Worchester, Massachusetts, (l) the North East Lead Submit in 2013, (m) the Iron Sharpens Iron

event in 2014 in Rochester, New York, (n) the Iron Sharpens Iron Women's and (o) the Iron

Sharpens Iron event in 2014 in Syracuse, New York, and (p) additional meetings and events that

the Claimant had set up and planned to go to in at least 2014, 2015 and years beyond.

## IV.  APPLICABLE AGREEMENT PROVISIONS

82. The relevant provisions of the RR Agreement and the FA Agreement (Exhibits C and E)

concerning Claimant's purported independent contractor status and the arbitration provision in

one of the agreements are provided above (pages 7-10, ¶¶ 11-19).

83. In addition to these provisions, both agreements have similar termination provisions that

were never followed when the Thrivent Respondents terminated them both on August 6, 2014.

The termination was unilateral and without notice, cause or justification and a material breach of

each agreement. The termination provisions (Exhibit C, page 3, Section III.C. and Exhibit E,

page 3, Section III.C.) recite:

> "This Agreement may be terminated: (1) upon thirty (30) days'
> notice by either Party for any reason at any time, with or without
> cause, (2) upon notice by either Party at any time if the other Party
> has breached this Agreement and/or (3) by mutual consent of the
> Parties at any time. Breaches of this Agreement include, but are
> not limited to: (1) the breach of any term or provision of this
> Agreement, (2) Representative's failure to comply with the
> Company's rules, regulations, policies, practices, procedures,
> standards or instructions or (3) Representative's failure to maintain
> any of the following as required by the Company: minimum

production standards; Company fidelity bond, errors and omissions insurance, registrations or licenses."

"This Agreement may be terminated: (1) upon thirty (30) days' notice by either Party for any reason at any time, with or without cause, (2) upon notice by either Party at any time if the other Party has breached this Agreement and/or (3) by mutual consent of the Parties at any time. Breaches of this Agreement include, but are not limited to: (1) the breach of any term or provision of this Agreement, (2) Contractor's failure to comply with the Society's rules, regulations, policies, practices, procedures, standards or instructions or (3) Contractor's failure to maintain any of the following as required by the Society: minimum production standards; Society membership, fidelity bond, errors and omissions insurance, registrations or licenses."

84. Thus, on August 6, 2014, the Thrivent Respondents did not follow any of the potential avenues for termination set forth explicitly in the two agreements since there was no 30 day notice to Mr. Bibow (per (1)), no breach by Mr. Bibow (per (2)) and no mutual consent with Mr. Bibow (per (3). Regarding part (2) specifically, Mr. Bibow did not breach any terms; fail to comply with rules, regulations, policies, practices, procedures, standards or instructions (valid or invalid); or fail to maintain minimum production standards, Society membership, fidelity bond, errors and omissions insurance, registrations or licenses. Therefore, the Thrivent Respondents actions on August 6, 2014 and thereafter, where they (a) purportedly terminated the agreements but without proper cause or justification, (b) demanded and took under threat of legal action (Exhibit T) Mr. Bibow's prospective client and client lists and other documentation for his independent contractor business, and (c) did not compensate Mr. Bibow for past, current and future sales to the clients he generated and was responsible for obtaining, were material breaches of the agreements requiring remedy.

---

## V.  ARGUMENT FOR THE CLAIMANT

---

A.    **The Subject Matter In Arbitration, the**
       **SDNY Action and Relief Already Obtained**

85. The RR Agreement contains an arbitration provision but the FA Agreement does not. Exhibits C and E. Both agreements have much in common, including the creation of an independent contractor relationship and the sale of insurance and annuities, and thus they overlapped in their application to Claimant's day-to-day activities and their actual coverage cannot be practically distinguished. Claimant requests that the Thrivent Respondents, FINRA, and the Panel agree that all issues relating to the Thrivent Respondents' relationship to him, including all issues concerning both the RR Agreement and the FA Agreement, be brought forth and resolved in this arbitration.

86. In the event that the Thrivent Respondents do not agree to determine all such issues here, to protect his rights the Claimant has concurrently filed an action in the United District Court for the Southern District of New York ("SDNY action") and attached the complaint here and incorporate it by reference herein. Exhibit R. Claimant may take action in that suit depending on the scope of this arbitration, Thrivent Respondents' posture concerning the FA Agreement and its lack of an arbitration provision, and other issues concerning the Thrivent Respondents' relationship with Claimant.

87. In addition, to further affect the determination of Claimant's causes of action in this arbitration, Claimant negotiated and entered into a stipulation with the Thrivent Respondents in the SDNY action for a protracted, nearly two month period. The Court signed the stipulation into an Order of the Court (Exhibit S). In pertinent part, the Order requires the parties to submit their claims arising under the FA and RR Agreements to this arbitration:

2.     The plaintiff and the Thrivent defendants agree to submit, according and pursuant to the appropriate rules, deadlines, and timelines for the amendment of claims in the Financial Industry Regulatory Authority ("FINRA") Industry Code or as may be set forth in any FINRA order concerning scheduling, any claims or causes of action that arise from (a) the May 20, 2013 Financial Associate Agreement between Mr. Bibow and Thrivent Financial for Lutherans, and (b) the May 20, 2013 Registered Representative Agreement between Mr. Bibow and Thrivent Investment Management Inc., for final determination, to the FINRA Arbitration proceeding Case ID 14-03702 (the "FINRA Action").

88. The status of the SDNY action at the time of the filing of this paper is that Claimant (i.e., plaintiff in the SDNY action) requested a stay of the action pending the resolution of this arbitration and the Thrivent Respondents (i.e., the defendants in the SDNY action) concurred. On February 3, 2015, the Court ordered the stay Claimant requested of the SDNY action pending the resolution of this arbitration. Exhibit U.

89. The Order also provided Claimant with the equivalent of the injunctive relief it was seeking in the Claimant's original Statement of Claim filed on December 13, 2014. Thus, paragraph 6 of the Order requires the Thrivent Respondents to no longer use Mr. Bibow's name or likeness in their marketing and paragraphs 7-9 of the Order provides the equivalent of injunctive relief prohibiting certain of the libel, slander and defamation practiced by the Thrivent Respondents and its agents. Exhibit S.

90. The Order also provided Claimant with the requirement that the Thrivent Respondents not destroy relevant documents (paragraph 5) and the requirement that the Thrivent Respondents must provide Claimant with a copy of Mr. Bibow's Contract and Licensing File that the Thrivent Respondents maintained in connection with Mr. Bibow's engagement (paragraph 10). Exhibit S. Claimant understands that this latter file is equivalent to the personnel files kept by a typical company for its employees. As discussed above, sets of documents were produced to Claimant on January 30, 2015 and February 4, 2015 but they were missing many of the relevant and

critical documents at issue here, including the complete form of Respondents' letter terminating Claimant's agreements and the documents underlying the false Form U5.

91. As set forth herein, and as evidence of further and unnecessary harm inflicted on Claimant, the Thrivent Respondents refused to provide these and other relevant documents, including Mr. Bibow's independent contractor files (e.g., his customer or client lists), the other relevant files on the laptop computer he used for his independent contractor business with Thrivent (e.g., expense reports, performance dashboard, campaign results, evidence of commissions not paid), and the documents underlying the false Form U5 statements, which are highly relevant, critical documentation relating to his claims in this arbitration. These Thrivent actions should also be considered in fashioning an award here.

92. Continuing and worsening the harm is simply part and parcel to the Thrivent Respondents' overall wrongful and inequitable behavior against Claimant, each of the Respondents' violating laws, rules and regulations and normal courses of conduct in business and other settings that should be brought to a stop and remedied in this arbitration proceeding. The violations known to Claimant at this time, without the benefit of discovery and the information the Respondents took from Claimant after terminating his agreements, are further set forth below.

**B.**     **Conversion, Theft, Attempts at Such and Conspiracy to Do So**

93. The facts demonstrate that the Respondents and their officers, managers, partners, employees and independent contractors intentionally and willfully attempted to convert (and attempted to steal) and did convert (and steal) the prospective clients, clients, method and profits of Claimant. This civil (and criminal) conversion and theft were done by several of Respondents' people acting together in concert ("Conspirators").

94. The Conspirators included officers, managers, partners, employees and purported independent contractors of the Respondents. Exhibit S. Specifically, the officers and managers included CEO Brad Hewitt and SVP James Thompsen who, for example, worked together and were caught attempting to steal and stealing Claimant's prospective clients and clients of the New Canaan Society. These two officers also had supervisory responsibility over the other Conspirators and directed their wrongful actions. Other officers who were part of the Conspirators who were caught attempting to steal and stealing were SVP Knut Olson and VP Michael Fuehrmeyer who were intimately involved in and also responsible for the wrongful activities of the other Conspirators, which included Managing Partner Timothy Campbell and Partners Michael Gollenberg, and Paul Marks, employees Marie Uhrich, Kent Tedford, James Belind and Tina Paulson, and purported independent contractors Marcus Gollenberg, Sam Chang, Alice Reitz, Jon Skov, and Nolan Johnson. Additional Thrivent agents who were involved are listed herein.

95. As described above, these officers, managers, employees, partners and purported independent contractors worked together and attempted to convert, attempted to steal, converted and stole Claimant's prospective clients, clients, method, and resulting revenue, specifically from Iron Sharpens Iron, Christian Festival Association, New Canaan Society, K-LOVE, and others, amounting to a monetary loss of significantly more than $100M. Claimant had originated these prospective clients and clients for his business method, developed a deep and meaningful relationship with them, and they were his as an independent contractor pursuant to the FA and RR Agreements. The Respondents had no previous relationship with these clients and their business before Claimant.

96. As also described above, these officers, managers, partners, employees and purported independent contractors wrongfully (1) demanded Claimant's client lists and other information, while he was engaged by the Thrivent Respondents and after his agreements were terminated (e.g., taking his laptop computer), running roughshod over his purported independent contractor status, (2) used and still use Claimant's lists, method and other information to contact the prospective clients and clients without Claimant's knowledge or consent, (3) attempted to make and made separate and undercutting deals with Mr. Bibow's prospective clients and clients (e.g., Iron Sharpens Iron, Christian Festival Association, New Canaan Society, and K-LOVE) after first learning of the clients from Claimant, (4) terminated Claimant's FA and RR Agreements with false reasons and in willful breach of the agreements, (5) blackballed Mr. Bibow from his industry by false and defamatory statements made to prospective clients, clients, and prospective employers (e.g., false Form U5), (6) misrepresented to Claimant's prospective clients and clients at events and in marketing materials that Mr. Bibow was still engaged with the Thrivent Respondents, (7) kept for themselves the money Mr. Bibow had earned and generated, (8) refused to correct their false and defamatory statements, (9) refused to return the wrongfully obtained prospective clients and clients and the lists thereof, and (10) unnecessarily, unreasonably and inequitably refused to cooperate and delayed resolution of these disputes.

97. The elements of common law conversion, attempted conversion and conspiracy to convert in New York, Connecticut and New Hampshire are met here when Claimant had clear ownership and rights to his prospective clients, clients and lists of such and the revenue generated from the resulting business; the Respondents and Conspirators wrongfully took those prospective clients, clients and lists of such and the revenue generated from the resulting business; the Respondents and Conspirators also wrongfully blackballed Claimant from the

industry and delayed and refused to remedy the harm; Claimant was damaged by the blackballing and loss of revenue that would be generated and was generated from the prospective clients, clients and lists of such and Claimant should get all of it back; and Respondents have refused to return what they took and to counter their effective blackballing of Claimant from the industry. The elements of theft, attempted theft and conspiracy to do so are also met because this was all done with wrongful, knowing intent and knowledge that their actions would harm Claimant. In fact, harming Claimant was part of their plan in order to remove him from competition. Compensatory and special damages ($100M) and punitive damages ($100M) are warranted.

**C.      The Thrivent Respondents' Sham Independent Contractor Scheme**

98. The FA and RR Agreements unequivocally and expressly create an independent contract relationship between agents such as Claimant and the Thrivent Respondents. Exhibits C and E. These agents are to run their own businesses in the manner they see fit (obviously within the confines of the rules, regulations and practices of the security industry) without the interference of Thrivent.

99. The Thrivent training materials and the related oral communications of Michael Gollenberg and Timothy Campbell all assert that the independent contractors are building their own businesses with their own clients and that they are there to help. However, the evidence of how the relationship was actually performed demonstrates that the Thrivent Respondents demanded that they control the agents' business and their prospective clients and clients and they required the agents to perform as employees but without any of the benefits of employment.

100.  Specifically, the Thrivent Respondents' and several of the Conspirators (i.e., Brad Hewett, James Thomsen, Michael Fuehrmeyer, Timothy Campell, Michael Gollenberg, Paul

Marks, Kent Tedford, James Belind and Marcus Gollenberg) treat the purported independent

contractors under the FA and RR Agreements as employees and not as independent contractors.

Treating agents as independent contractors is well known to offer firms several advantages such

as certain lower tax and benefit obligations. Evidence that Thrivent is misusing the designation

includes the fact that Thrivent contends that they own the agents' clients, as they did with

Claimant when they repeatedly asked him for his client lists and then again when they threatened

legal action if he did not provide them with his files after his agreements were terminated, which

included his client information and lists. Exhibit U. An independent contractor such as Mr.

Bibow who had discovered and developed a new client such as Iron Sharpens Iron, New Canaan

Society, Christian Festival Association members, SoulFest, KingdomBound, Young Live,

Navigators, Pulse Movement and others, "owns" those clients, not Thrivent.

    101.  Thrivent also treated the independent contractors as employees and not as independent

contractors when they attempted to go around Claimant and take the clients for themselves. In

each instance, the same scenario repeated itself: acting to develop his own business, Claimant

would identify, approach and create a relationship with an organization (e.g., Iron Sharpens Iron,

Christian Festival Association, New Canaan Society, SoulFest, KingdomBound, Young Life,

Navigators, Pulse Movement) that no one at the Thrivent Respondents had identified,

approached or created relationships with before. Claimant then informed Thrivent of his plans as

part of Thrivent's strenuous reporting requirements. Thrivent (e.g., Brad Hewett, James

Thomson, Michael Fuehrmeyer, Timothy Campbell, Michael Gollenberg, Paul Marks, Kent

Tedford, James Belind, Marcus Gollenberg, Sam Chang) would then take this information, go

behind Claimant, and try to undercut his relationship and take the business for themselves

without compensating Claimant.

102. Kent Tedford's behavior with respect to Claimant's clients and Paul Marks' behavior at the KingdomBound event in August of 2014 also demonstrate Thrivents' attitude that Claimant's business was theirs for the taking and that they had every right to give him orders as if he were an employee. At the KingdomBound event, for example, Paul Marks treated Claimant with hostility and contended that Claimant should not have gone to the event even though, as an independent contractor, he had every right to be there. In addition, Claimant had relationships and business with the people who had organized the event.

103. In addition, as described above, the Thrivent Respondents' recent actions have confirmed that they treat the purported independent contractors as employees as they scrambled, unsuccessfully, to provide a justification for the Form U5 statements they have made against Claimant. First, they contend that Mr. Bibow was "Discharged," a term correctly applied only to employees. Secondly, when challenged, Thrivent contended that the Form U5 statement was based upon an oral statement by Michael Fuehrmeyer, who had allegedly instructed Claimant to not seek to share business from other independent contractors. Thrivent dropped this justification when they were unable to find an instance when Claimant did not follow such an instruction (assuming, of course, that it had been given).

104. Next, Thrivent retreated to an alleged instruction that Paul Marks had given Claimant to not attend the August 2014 KingdomBound event. Respondents also dropped this alleged instruction as justification for their Form U5 statement when their purported evidence, the August 2014 email from Claimant, did not support the assertion. Since then, in the last two months, Respondents have refused to provide any explanation whatsoever for the Form U5 statement even though they are well aware that the statement is the basis for Claimant not obtaining employment. When the Court in the SDNY ordered the production of the file that

would contain the underlying documents concerning the false Form U5 statement, it was found to be conveniently empty of these critical documents.

105.  We will see if in the last two months the Thrivent Respondents can come up with another story, but, in any event, what is clear is that both of the proposed (yet abandoned) justifications have in common an instruction on how to do business that should not and could not be given an independent contractor who is responsible for their own business. The Thrivent Respondents simply did not have the power under the FA and RR Agreements to force Claimant to follow the alleged "Instructions Concerning Thrivent Sponsored Events."

106.  In light of the above, Claimant requests that the Arbitration Panel determine that the Thrivent Respondents' independent contractor scheme is a sham and that Thrivent does not treat its agents like Claimant as independent contractors, in breach of the agreements.

**D.  Revocation and Suspension of the Thrivent Respondents' Licenses**

107.  It is telling that the Thrivent Respondents and the Conspirators were so set on taking Claimant's business that they would ignore client's specific and express desires, in violation of their duties to clients. They did this with Iron Sharpens Iron (e.g., Brian Doyle and Darien Stone will testify that Thrivent distributed tickets against Brian Doyles' express directions and ignored the request to only deal with Mr. Bibow (Kent Tedford and Sam Chang)), New Canaan Society (e.g., Jim Lane and Paul Michalsky will testify that Thrivent ignored the request to only deal with Mr. Bibow (Brad Hewitt and James Thomsen)), SoulFest and NewSound Concerts (e.g., Dan Russell will testify that Thrivent ignored their request to only deal with Mr. Bibow (Kent Tedford and Jim Beland)). That these activities were permitted is further evidence of a breach of the duty to supervise by the Thrivent Respondents, Brad Hewitt, James Thomsen, Michael Fuehrmeyer and Timothy Campbell and the others who were responsible for such supervision.

108. The egregiousness of Thrivents' actions is put in context by the multiple violations of FINRA rules and regulations that the Thrivent Respondents engaged in several times. This provides a backdrop that demonstrates how such extreme misconduct resulted from the wrongful actions of the officers, managers, employees and partners. There was a significant lack of supervision and compliance within the highest levels of the Thrivent Respondents that permitted the misconduct that happened here. Thus, this lack of supervision and non-compliance permitted such misconduct that included (a) their conspiracy to steal clients, (b) failure to investigate HR complaints and FINRA violations (i.e., concerning Jim Tedford, Sam Chang and Paul Marks), (c) falsely claiming "independent contractor" relationships, (d) non-compliant advertisement, (e) solicitation of clients while lacking the proper licensing, (f) blackballing Claimant from the industry and making false statements in Claimant's Form U5 and delay and failure to correct the false Form U5, (g) delinquent Form U5 reporting after the deadline, (h) fraudulent use of Claimant's name and likeness at trade shows (e.g., Soulfest 2014) and print materials (as late as December 2, 2014) after Claimant's agreements were terminated, and (i) incompetent record keeping concerning Claimant's Licensing and contract file. This was all part of a desperate grab of Claimant's business that should result in a declaration that the Respondents violated the applicable FINRA rules and regulations.

109. Furthermore, the security-related licenses of the Thrivent Respondents' and the Conspirators (i.e., Brad Hewett, James Thomsen, Knut Olson, Michael Fuehrmeyer, Timothy Campell, Michael Gollenberg, Paul Marks, Marcus Gollenberg, Sam Chang, Alice Reitz, Jon Skov and Nolan Johnson) should be revoked or suspended for an amount of time that would put Claimant back where he should be but for their wrongful actions, at a minimum leaving Claimant enough time and opportunity to apply his method to his prospective clients and clients without

further wrongful interference. This should include at least three meeting cycles of the Iron Sharpens Iron, Christian Festival Association, New Canaan Society, and SoulFest, or a minimum of three years, which would allow Claimant a minimum amount of time and access to his clients and attempt to undue the harm.

110.  In addition, the licenses should be revoked or suspended because the Thrivent Respondents and the Conspirators have violated several laws, rules and regulations. This includes conversion and theft and attempts and conspiracies to do so, defamation, libel and slander as described herein.

**E.      Breach of Contract**

111.  The evidence demonstrates that (1) there were two agreements, each with limited termination provisions (Exhibits C and E), (2) there is no issue that the agreements are enforceable, and (3) the Thrivent Respondents willfully breached their obligations under the agreements, each breach being a material one. They willfully breached the provisions that require them to treat Claimant as an independent contractor and allow him to fully enjoy the fruits of that bargain.  He took on the risks but was denied the rewards. They willfully breached the letter and spirit of the agreements by otherwise interfering with his business:  they (Exhibit S) conspired to try to take his business, prospective clients and clients and method for themselves without justification and they tried to control him and his business and clients in direct violation of the express language of the agreements that said that they could not and that he was free to sell as he chose. They also willfully breached the agreements by not honoring their implied covenant of good faith and fair dealing by acting so wrongfully.

112.  The Thrivent Respondents also willfully breached the agreements by not fairly compensating Claimant for all of the business he helped to generate with his business method

and generation of huge numbers of valuable prospective clients that the Thrivent Respondents are still applying today. The Respondents' termination of the agreements on August 6, 2014 was also a material, willful breach with no justification.

113.   The Thrivent Respondents willfully and materially breached the agreements in various jurisdictions (New York, Connecticut, New Hampshire) with law that uniformly agrees that relief should be granted in the form of compensatory ($100M) and punitive ($100M) damages, attorney fees, costs and expenses.

**F.**   **Wrongful Retaliation**

114.   The Thrivent Respondents wrongfully retaliated against Claimant. They did this by treating him with hostility and unfairness while he was working as an independent contractor. They also did this by terminating his agreements without justification. Their reasons were nefarious. They treated him so wrongfully because they did not want to provide him with his share of the business he had generated, including the business from the huge numbers of prospective clients and clients his method generated. They also did this because he did not just sit by and let this happen but instead he requested his share of revenue. They also did this because in their haste to take his business they stumbled over FINRA rules and regulations that were in their path concerning advertisements, solicitation of customers, false Form U5 statements, delinquent Form U5 reporting and other violations, certain of which Claimant was compelled to report and did report properly.

115.   Several laws, rules and regulations apply to the Thrivent Respondents wrongful retaliation against Claimant. This includes the SEC Whistleblowing provisions (15 U.S.C. § 78), FINRA rules and regulations, and state (New York and Connecticut) employment wrongful retaliation laws. All apply and lead to the same conclusion that the Thrivent Respondents

wrongfully retaliated against Claimant and the harm has been severe and should be remedied.
Mr. Bibow has been unable to obtain employment because of the Respondents' conduct,
including their false Form U5 reporting, which should be compensated with, among other things,
monetary damages ($100M), attorney fees, interest and costs and expenses.

**G.**    **Tortious Interference**

116.   The Thrivent Respondents tortiously interfered with Claimant's business by not
treating him as an independent contractor and by otherwise interfering with his business. They
wrongfully attempted to take his business, prospective clients and clients, by extreme, unjustified
means that are not acceptable business practices. They also wrongfully did not compensate him
fully for the business he was responsible for generating and pursuant to the written agreements
he had in place with other agents and RFO115, his group. They also did not compensate him
fully for the business he would generate in the future based on his efforts. They also wrongfully
did not honor their obligations to him fully and wrongfully terminated their agreements with
him, damaging his current and future prospects.

117.   The Claimant's tortious interference occurred in several states, but mostly in New
York, Connecticut, and New Hampshire. The law of each of these states, and all of the other
states where the interference occurred, lead to the same universal conclusion that the Thrivent
Respondents willfully and tortiously interfered with Claimant's business, contracts and
prospective advantage and remedies are required, including compensatory ($100M) and punitive
($100M) damages for the economic loss and mental distress awarded to Claimant.

**H.**    **Unfair Competition, Misappropriation and Related Torts**

118.   The Thrivent Respondents engaged in intentional, willful and wanton unfair
competition against Claimant in their breach of their contractual obligations discussed above,

abandonment of all decorum and fair dealing in their haste to attempt to take his business, prospective clients and clients, their coopting of his business method, their undercutting of his independent contractor efforts, their wrongful use of his name and likeness even after his agreements were terminated, and their filing and maintaining false Form U5 statements.

119. The Thrivent Respondents also engaged in intentional, willful and wanton misappropriation of Claimant's business, prospective clients, clients, name and likeness and business method. They did this with their breach of their contractual obligations discussed above, abandonment of all decorum and fair dealing in their haste to attempt to take his business, prospective clients and clients, their coopting of his business method, their undercutting of his independent contractor efforts, their wrongful use of his name and likeness even after his agreements were terminated, and their filing and maintaining false Form U5 statements so that no employer would hire him.

120. Federal law of unfair competition under the Lanham Act (15 U.S.C. § 1125) as well as the laws in each of the states involved, including New York and Connecticut, lead to the same result that the Thrivent Respondents engaged in unfair competition, misappropriation, and other, related torts, to harm Claimant and benefit themselves. Claimant is thus entitled to compensatory damages relief ($100M).

## I.     Unjust Enrichment and Restitution

121. The Thrivent Respondents were unjustly enriched in their wrongful actions concerning Claimant, which were all done for Respondents' profit. They did not treat him as an independent contractor and otherwise interfered with his business, prospective clients and clients, taking his business, prospective clients and clients and benefitting from this wrongful conduct. They also did not honor their implied covenant of good faith and fair dealing in their actions to take his

business. They also did not compensate and honor their obligations to compensate him fully. They also terminated the two agreements without justification in order to further their conspiracy to take his business. They also misappropriated his name and likeness at a festival and in sales and other pieces as part of their efforts to take the results of his business method, prospective clients, clients and they used his documents and other information they had or retrieved after the agreements were terminated to take his business.

122.   The states in which the Thrivent Respondents' wrongful conduct occurred (New York and Connecticut) all have laws against unjust enrichment and provisions for restitution of such losses ($100M), and they all apply here to provide relief to Claimant.

**J.**   **Trade Libel and Defamation**

123.   As part of their scheme, the Thrivent Respondents committed trade libel and made defamatory statements concerning Claimant, including the making of false statements to his prospective clients and clients that implied he was not ethical, and to co-workers, prospective clients and clients at the KingdomBound event. False statements were also made for any prospective employers to see in Form U5 statements, which had the intended harm. Prospective employers believe the Form U5 statements mean that Claimant was fired for cause, when he was never an employee and the real reason his agreements were terminated was the wrongful conduct of the Thrivent Respondents, and nothing Claimant did.

124.   These harmful statements were made in several states, including New York and Connecticut, that all have common law causes of action for trade law and defamation, and which all provide relief including corrective actions such as informing the public and the misled individuals of the truth. Mr. Bibow should also be compensated for his loss of revenue ($100M) that the libel and defamation have stopped him from getting.

**K.    Intentional Or Negligent Infliction of Emotional Distress**

125. In their conspiracy and schemes to harm the Claimant and remove him from competition, the Thrivent Respondents intentionally and negligently (the Respondents had a duty to treat Claimant fairly and in a non-harmful manner as their independent contractor) inflicted emotional distress on Claimant by their actions, including by treating him with hostility, by breaching their agreements with him, by not treating him as an independent contractor, by otherwise interfering with his business, by trying to take his business, prospective clients and clients, by not honoring their implied covenant of good faith and fair dealing, by not compensating and honoring their obligations to him fully, by their termination of his agreements without justification, by trade libel or defamation, or by their actions after their termination of his agreements where they used his business method, prospective clients, clients, documents and other information they had or retrieved, and his name and likeness.

126. This application of the wrongful conduct happened in several states, including New York and Connecticut, which all have laws concerning the intentional and negligent infliction of emotional distress, and which provide remedies that apply here that include compensation for medical care.

**L.    Right of Publicity**

127. The Thrivent Respondents infringed Claimant's right of publicity by their actions, including by falsely stating he was at the 2014 SoulFest event and stating or implying he was still working with the Respondents, and by their use of his name and likeness in advertisements and sales literature to attempt to take his prospective clients, clients and new clients.

128.   The states in which the Thrivent Respondents misappropriated Mr. Bibow's name and likeness (i.e., New Hampshire, New York, Connecticut) all have a right of publicity that was infringed and he should be compensated for the taking.

## M.   **Withholding of Compensation**

129.   The Thrivent Respondents withheld reimbursements and compensation from Claimant from past, current and future revenue generating events. The Thrivent Respondents took Mr. Bibow's laptop and other documents when his agreements were terminated and thus they have the relevant documents that will establish exactly how much of Mr. Bibow's rightful compensation is still being withheld. In addition, Mr. Bibow should obtain compensation for any revenue the Thrivent Respondents acquire by virtue of their application of his method, techniques, prospect lists and client lists.

130.   New York and Connecticut, where this withholding occurred, include a double recovery of all such compensation that was withheld. In addition, the common law cause of action of quantum meruit requires that the Thrivent Respondents provide Mr. Bibow with the revenue and compensation he has earned.

## N.   **Additional Issues from Discovery and Evidence Taken by Thrivent**

131.   As stated above, the discovery held by the Thrivent Respondents, including the evidence taken from Claimant when his agreements were wrongfully terminated, and the testimony taken in this arbitration, may reveal additional harm, additional torts, additional FINRA violations and additional wrongdoing that should be remedied.

## VI. RELEIF REQUESTED

132. The Thrivent Respondents have caused severe harm, including by failing to fully compensate Claimant and effectively blackballing him from obtaining employment. Therefore, based on the information known and available to Claimant at this time, which should be updated with discovery provided by the Thrivent Respondents including the information they took from Claimant when his agreements were terminated, Claimant respectfully requests the following:

- A declaration that the Thrivent Respondents, their officers, managers, partners, employees and independent contractors converted and stole Claimant's prospective clients, clients, method, business and past and future revenue.

- A declaration that the independent contractor scheme applied by the Thrivent Respondents to Claimant and others is a sham and therefore finding that the agents are effectively treated as employees entitled to the protection and benefits that flow from such positions.

- A declaration that the Thrivent Respondents violated FINRA rules and regulations.

- Revocation and suspension of the securities licenses of the Thrivent Respondents and the Conspirators (including, e.g., Brad Hewitt, James Thomsen, Timothy Campbell, Michael Fuehrmeyer, Paul Marks, Michael Gollenberg, as identified above) to enable Claimant at least an opportunity to re-build his business and use his business method as it was designed.

- A declaration that the Thrivent Respondents: breached their agreements with Claimant; wrongfully retaliated against him; tortiously interfered with his contractual and business relations; unfairly competed with him; misappropriatedand took Claimant's image, name, prospective clients, clients, method, business and revenue; were unjustly enriched by their actions; and libeled and defamed Claimant.

- Expungement of the Thrivent Respondents' defamatory and false statements concerning the Claimant from the Form U5 statements and anywhere else they appear;

- Corrective actions, including advertisements and notices, addressed to counteract the Thrivent Respondents' defamatory and false statements concerning the Claimant, and otherwise putting Claimant back in the position he would have been in but for the Thrivent Respondent's wrongful actions;

- Compensatory damages of at least $100M and punitive damages of at least $100M awarded to Claimant;

- Double recovery of all expense reimbursement and earned compensation wrongfully withheld;

- A declaratory judgment declaring null and void and otherwise releasing the Claimant from any further obligations under the FA Agreement and the RR Agreement; and

- Judgment, jointly and severally, against the Thrivent Respondents, together with attorney fees, statutory, pre and post decision interest, expert fees, the other costs and disbursements incurred in this arbitration, and such other and further relief as the Panel deems just and proper.

## VII.  CONCLUSION

133.   Based on the foregoing, with the additional discovery that only Respondents have and that they took from Claimant after his agreements were terminated, Claimant respectfully requests that the Thrivent Respondents be ordered to remedy all harm they have caused and pay the punitive damages that are set forth above and that are established at the hearing.

Dated: New York, New York
      February 5, 2015

By: _____
          Donald L. Rhoads

*ATTORNEYS FOR CLAIMANT*
Rhoads Legal Group PC
100 Park Avenue, Suite 1600
New York, New York 10017
(212) 351-5087